TRANSWESTERN LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT, v. NEVADA UNDER-WRITERS, INC., RESPONDENT.

No. 5843

April 30, 1970                    468 P.2d 983

---

*Ross & Crow,* of Carson City; and *Lewis, Roca, Beauchamp & Linton,* and *John P. Frank,* of Phoenix, Arizona, for Appellant.

*V. Gray Gubler,* of Las Vegas, for Respondent.

## OPINION

By the Court, MOWBRAY, J.:

This appeal is from a judgment of the district court awarding $65,625 damages to respondent, Nevada Underwriters, Inc., resulting from the failure of appellant, Transwestern Life Insurance Company, a Montana corporation, to timely issue 75,000 shares of appellant's stock that respondent had the right to purchase under a stock option agreement between respondent and a predecessor Nevada corporation that later merged into the appellant Montana corporation. The stock was issued, but only after registration with the Securities and Exchange Commission. The registration and qualification with

the SEC required several months. Between the time the option was exercised and the effective date of the registration with the SEC, the price of the stock went down, which is the predicate for the award of damages.

Numerous assignments of error and issues of law have been cited for our consideration. We believe that all relevant questions presented may be summarized in one issue, namely: When did the duty to register the stock with the SEC, under the factual posture of the case, come into existence?

It is respondent's position that the duty to register the stock came into existence immediately after the merger of the predecessor Nevada corporation with appellant, so that if, as, and when respondent elected to exercise its option rights under the agreement, appellant would at all times during the remaining period of the option be poised to deliver the stock. Appellant urges that the duty to register with the SEC came into existence on July 31, 1964, the date respondent exercised its option to purchase the 75,000 shares. We agree, and we reverse the decision of the district judge, with instructions to enter judgment in favor of appellant.

1. *Factual Background*

In 1958, Joseph Y. Larsen, Jr., and Lincoln Hanks participated in the formation of a Nevada corporation named Transwestern Life Insurance Company, which we shall refer to in this opinion as NEVADA. On January 11, 1963, NEVADA was merged into a Montana corporation known as New American Life Insurance Company. The Montana corporation ("MONTANA") adopted the name of the Nevada corporation, Transwestern Life Insurance Company, and is the appellant in this case.

Prior to the merger in January 1963, the following events occurred in Nevada. At the time NEVADA was organized, in 1958, Larsen and Hanks set up another Nevada corporation, known as Underwriters Incorporated of Nevada, regarding which Larsen testified:

"Q [by Mr. V. Gray Gubler, attorney for Nevada Underwriters, Inc.] And did you have a connection with Transwestern Life Insurance Company in its organizational period?

"A [by Larsen] Yes, I did. I was one of the two organizers [Larsen and Hanks] at that particular time, when the company was organized, and we organized a company called Underwriters Incorporated of Nevada, which handled the original issues for the company in capitalizing that particular insurance company."

Larsen testified that it took 40 working days to sell the

original 20,000 shares of stock of NEVADA. These were sold only to Nevada residents, under section 3(A)(11) (an intrastate exemption from registration) of the Securities Act of 1933.

At the first meeting of the newly formed NEVADA, on August 25, 1958, the board of directors granted to Underwriters Incorporated the right to purchase 9,000 shares of the stock of NEVADA. The option provided, in part:

"TRANSWESTERN LIFE INSURANCE COMPANY, a Nevada corporation, . . . hereby grants and extends to UNDERWRITERS INCORPORATED OF NEVADA, a Nevada corporation, . . . an option to acquire 9,000 shares of the $10 par value nonassessable capital stock of the Corporation at $50 per share . . . ."

Larsen assisted in the drafting of the option agreement, and he testified during the trial that NEVADA, which he helped form in 1958, could not sell unregistered shares of stock unless the sale was restricted to Nevada residents. As he stated:

"The shares of the original underwriting, as well as the second underwriting *and the option shares,* were issued in reliance on the 3–A–11 exemption . . . *and the shares would be sold to bona fide residents of the State of Nevada,* complying with this 3–A–11 exemption." (Emphasis added.)

Larsen and Hanks dissolved their association after the underwriting of NEVADA was completed. On February 16, 1959, they signed an agreement dividing the assets of Underwriters Incorporated. Larsen formed and designated another and new Nevada corporation, Nevada Underwriters, Inc., to receive his share of the option rights under the option agreement held with NEVADA. The Hanks-Larsen agreement limited the transfer of the option rights to "any Nevada resident or Nevada corporation designated by Larsen." The agreement was litigated in 1961 in Nevada's Eighth Judicial District Court, where it was determined that Larsen's corporation, Nevada Underwriters, was entitled to one-half of the option rights not yet exercised; the remaining rights were awarded to Hanks's Underwriters Incorporated. (Of the 9,000 shares, 4,000 had been issued under the option agreement; so the remaining 5,000 shares were divided between the two corporations.) Thereafter, NEVADA had a 10–1 stock split, increasing respondent Nevada Underwriter's option to 25,000 shares of NEVADA, which rights were further multiplied at the time of the Nevada and Montana corporations' merger in January 1963, when NEVADA stockholders were given

stock in MONTANA on the basis of 3 shares of MONTANA for 1 share of NEVADA.

At the time of the Nevada and Montana corporations' merger, it was agreed by MONTANA, in Section 6.(e) of the Agreement of Merger, that:

"Stock options heretofore granted by any of the constituent corporations shall, to the extent not exercised prior to the merger, continue in effect *in accordance with their terms,* except that a person exercising such options shall receive, in respect of each share of common stock of the constituent corporation for which any such option is exercised, and on payment in accordance with said terms, the equivalent number of shares of common stock of the Combined Corporation as determined in accordance with the applicable conversion ratio hereinbefore fixed." (Emphasis added.)

2. *Exercise of the Option*

Larsen made no attempt, nor did he give any indication to MONTANA that he intended, to exercise his option rights until May 26, 1964. The merger was effective on January 11, 1963, and the option expired on August 1, 1964.

On May 26, 1964, Larsen journeyed to Montana and conferred with Albert A. Schlaht, President of MONTANA, and with MONTANA's counsel, Norman Hanson. Larsen did not, however, exercise any of his option rights during the May meeting. Hanson testified regarding the conference as follows:

"Q [by Mr. Blackstone, attorney for plaintiff-appellant during trial] Now at this point, Mr. Hanson, Mr. Schlaht testified as to conversations concerning what Mr. Larsen was expecting the company to do and the extent to which he expected to have the company honor the options. Do you recall a conversation along those lines?

"A [by Mr. Hanson] Mr. Larsen said he wanted to get his 20,000 shares of stock under his option. Wanted the company to issue it to him. We were talking only about the 20,000 shares, because I asked Mr. Larsen at the time what he planned to do about the remaining 55,000 shares of the option. And whether he was definitely going to exercise the balance at the end of the option period, July 31, [1964]. He said he would not make a commitment what he was going to exercise at that time, that he probably would, but he was not saying definitely that he would, at this time."

Larsen returned to Billings, Montana, on July 31, 1964, on the eve of the expiration of the option, and he did exercise in writing his full option rights to purchase 75,000 shares of

MONTANA stock for the total price of $106,250 by hand-delivering to Mr. Schlaht a letter of credit for that sum drawn on the United California Bank of Los Angeles and directed to the Security Trust & Savings Bank of Billings, extending Larsen credit for the $106,250 in exchange for *"unrestricted, freely transferable* certificates of your capital stock."[1] (Emphasis added.)

Larsen at the trial explained the "unrestricted, freely transferable" condition as follows:

"Q [by Mr. Blackstone] You said that you met with Mr. Schlaht on July 31. What did you—did you tender him anything, yourself?

"A Yes, I tendered him a bank draft of a hundred six thousand two hundred fifty dollars and received a receipt.

"Q Referring then to Plaintiff's Exhibit I is a bank draft or customer's draft for a hundred six thousand two hundred fifty dollars. It's on Security Trust & Savings Bank, it says 'payable on demand'—pardon me, it says '[O]n demand, when accompanied by 75,000 unrestricted shares of Transwestern capital stock, pay to the order of Transwestern Life Insurance Company 106,250 and no one hundredths dollars.' This is the customer's draft you delivered to Mr. Schlaht?

"A Right.

"Q Mr. Schlaht made a photocopy of that, did he not, and returned the customer's draft to you?

"A Right.

---

[1]"SECURITY TRUST & SAVINGS BANK

Billings, Montana

| "Established 1916 | P.O. Box 2513 | Telephone Area Code 406 245–3011 |
|---|---|---|

Ray G. Spanier                                                          July 31, 1964
  Assistant Vice President

Transwestern Life Insurance Company
Billings, Montana

Gentlemen:
We have received an authenticated wire from the United California Bank, Los Angeles, California, that they have opened an irrevocable sight letter of credit in your favor against the account of Joseph Y. Larsen in the amount of $106,250.00, when the draft is accompanied by unrestricted, freely transferable certificates of your capital stock totaling 75,000 shares. This refers to the option of the Nevada Underwriters, Inc. This letter expires August 7, 1964.

                                        Very truly yours,
                                        R G Spanier
                                        R. G. Spanier
RGS-ls"                                 Assistant Vice President

"Q   Well, the expression in the letter of—from the Security Trust & Savings Bank, Exhibit H, stating that the payment will be made when accompanied by unrestricted, freely transferrable [sic] certificates of your capital stock, totalling 75,000 shares, those were the instructions you had given to the bank, is that correct?

"A   These were the requirements—in other words, I told them to draft this in accordance with the agreement. In other words, to request unrestricted stock as set forth in the agreement. And the reason I requested the unrestricted part was because of their attempt to class this as investment stock. There had been some discussion with Mr. Schlaht as to stamping these certificates as investment stock. So there was no call for this under the option and I asked for unrestricted stock.

"Q   Mr. Larsen, may I have the stock option itself? I think we—you established earlier, did you not, yesterday, that there was no language in the stock option itself that says shares that must be delivered must be unrestricted, freely transferrable [sic]. Do you recall that?

"A   It doesn't state that and it doesn't say it will be restricted either.

"Q   That's right. Now, when you called for freely transferrable [sic], unrestricted stock, were you asking—was it your intention that the shares be fully registered with the S.E.C. under a Registration Statement?

"A   At that particular time all I wanted was shares of stock issued that were unrestricted and not stamped restricted.

"Q   And you wanted them so you would be free to resell them at any time, that is correct, is it not?

"A   I wanted them so they could be resold, right.

"Q   You know, under the circumstances, you could not get such shares unless they were registered with the S.E.C.?

"A   Not at that time, since the 3A–11 exemption has been destroyed they had to be reregistered for them to be issued to me.

"Q   So that your letter was, in effect, was asking them to deliver to you shares that were fully registered with the S.E.C.?

"A   In essence I knew they had to be registered shares, right.

"Q   And I believe you testified earlier that there is nothing in the stock option itself which required shares to be registered with the S.E.C.? You can refresh your recollection if you wish to look at the stock option.

"A   There is nothing in the stock option that requires it to be issued or registered, right."

MONTANA moved immediately to secure registration of the stock with the SEC, so that it would be "unrestricted and freely transferable." This registration and qualification required time and expense ($31,860) to MONTANA, which is to be expected in such cases.

Larsen did not complain. He inquired by letter to Hanson as to the progress of the registration on October 22.[2] Hanson replied by letter dated October 30, 1964.[3] Other correspondence was exchanged between MONTANA and Larsen, and it would

---

[2]"October 22, 1964

"Mr. Norman Hanson
Attorney at Law
P.O. Box 2529
500 Electric Bldg.
Billings, Montana

Dear Norm:

I suppose the plans of registration are going forward as planned. Would you kindly drop me a line and let me know the present status of the registration with S.E.C.

Cordially yours,
Joe

Joseph Y. Larsen, Jr.

JL:jo"

[3]"October 30, 1964

"AIRMAIL

Mr. Joseph Y. Larsen, Jr.
Attorney at Law
15 East Fourth South
Salt Lake City 11, Utah

Dear Joe:                           Re:   SEC registration
                                          Transwestern Life
                                          Insurance Company

Answering your letter of October 22, Transwestern's Registration Statement was duly filed with the Securities and Exchange Commission, Washington, D.C. on September 25, 1964, where it is pending under file #2–22805.

I received your letter on October 26, and at that time we had heard nothing from the SEC. Hard on the heels of your letter however has come a lengthy deficiency letter from SEC, together with a statement that there will be a supplemental letter also forthcoming. I anticipate that it will be at least ten days or two weeks before we will know what amendments will be necessary, and at that time you will hear from me (because substantial portions of the SEC letter deal with the sales commissions, sale of stock by those exercising the options, etc.).

Yours truly,
NORMAN HANSON

NH:bb
cc:   A. A. Schlaht"

serve no purpose to restate it in this opinion, other than to observe in passing that it clearly shows MONTANA moved forward with all dispatch to qualify the stock with the SEC; that Larsen was fully advised of developments as they occurred; and that even a Supplement to the Prospectus, which had become effective on February 1, 1965, was later added, effective March 17, 1965.[4] This in effect cleared the way for Larsen to sell the stock as "unrestricted and freely transferable," which in fact he did in California shortly thereafter. The transaction for all ostensible purposes appeared to be concluded. Larsen accepted and sold the stock for a gain of over $33,000. The only item remaining was the question which gave rise to this action, namely: Which corporation, Larsen's or Hanks's, was entitled to the $9,375 commission resulting from the sale of the 75,000 shares to Nevada Underwriters?[5]

The first written demand for damages by Larsen for the failure of MONTANA to promptly deliver the stock came in the form of the counterclaim which is the basis of this appeal.[6]

Justice Holmes, writing as a Justice of the Supreme Judicial Court of Massachusetts, said in Parkinson v. West End St. Ry. Co., 53 N.E. 891, 892 (Mass. 1899), a case involving an action for damages for refusal of a successor corporation to

---

[4] "Supplement to Prospectus dated February 1, 1965

"Of the 205,851 shares of common stock offered to certain option-holders, 198,851 were subscribed for. The total proceeds of said 198,851 shares was $331,419; commissions thereon amounted to $49,713; so that, the proceeds to the Company were $281,706 (before deduction of expenses of $31,860 payable by the Company).

"The selling security holders shown at page 25 herein are offering their 75,382 shares of such common stock to the public, at the market price or at whatever negotiated price they can obtain. With reference to the status of the selling security holders see Note C on the cover page of the Prospectus.

"During the period January 1, 1965, through March 10, 1965, the high and low bid prices of the Company's common stock in the over-the-counter market were $2 and $1-⅝ respectively. On March 11, 1965, the highest bid and lowest asked prices of the stock were $1-⅝ and $2 respectively. These prices are as reported by National Quotation Bureau, Inc.

"The date of this Supplement is March 17, 1965."

[5] MONTANA commenced this case by filing in Nevada's First Judicial District Court an interpleader complaint asking the court to determine whether Underwriters Incorporated or Nevada Underwriters was entitled to the $9,375 commission. The court awarded the commission to Nevada Underwriters, and no appeal was taken from that judgment.

[6] Larsen indicated that he orally informed Schlaht and Hanson on May 26 and July 31, 1964, that he was holding MONTANA liable for damages. Hanson and Schlaht flatly deny Larsen's assertion, and his and MONTANA's later conduct belies the probability of any such statement.

deliver preferred stock to bond holders under a previous, approved plan to exchange the bonds for stock:

"When an option is given to take stock . . . [e]ven when embodied in the contract it imposes no restriction upon the obligor in regard to the issue of new stock, although the issue may be upon such terms as to diminish the value of the right. It leaves the management of the company in accordance with its other interests unhampered. It is simply an option to take stock as it may turn out to be *when the time for choice arrives.* . . . So, if the corporation . . . finds it for its interest to go out of existence at or before the maturity of the obligation, the option given . . . *will not stand in the way.* The option gives him merely a spes, . . . .

". . . [T]he contract does not prevent the corporation from consolidating with another in such a way as to make performance impossible, any more than it prevents the issue of new stock in such a way as to make performance valueless. . . . [T]he decision really turns upon the particular facts." (Emphasis added.)

Under the facts presented, we hold that MONTANA's duty to register and qualify with the SEC came into existence on July 31, 1964, when Larsen exercised on behalf of the respondent corporation the 1958 option to purchase 75,000 shares of MONTANA capital stock, and not prior to that date; that MONTANA did with reasonable dispatch qualify the stock with the SEC, so that it was unrestricted and freely transferable, as Larsen demanded. There being no failure of duty by MONTANA, the judgment cannot stand. It is, therefore, reversed, with instructions to enter judgment for appellant.

COLLINS, C. J., ZENOFF and THOMPSON, JJ., concur.

YOUNG, D. J., dissenting:

I do not concur with the majority.

The only duty of Montana as a result of the merger was to deliver "unrestricted and freely transferable" shares of stock to Nevada whenever Larsen exercised his option. Montana could take whatever steps it desired to secure "unrestricted and freely transferable stock," including issuing of new stock or purchasing previously issued stock on the open market. Failure on the part of Montana to fulfill its obligation to deliver "unrestricted and freely transferable" stock makes Montana liable to Nevada for any damage it suffered by Montana's failure to deliver the "unrestricted and freely transferable" shares of stock at the time Larsen or Nevada exercised its option.

The measure of damages is the value of the stock at the time of the exercise of the option less the value of the stock at the time of delivery. In the instant case, Montana did not deliver "unrestricted and freely transferable" shares of stock until April, 1965, although the option was exercised on July 31, 1964. The loss incurred by Montana's failure to deliver the required stock is the difference between the market value of the stock on July 31, 1964, which was $2.50 per share, and the price Nevada was able to sell its stock in April of 1965 which was $2.00 per share, or 50 cents per share. Nevada, therefore, suffered a loss of 75,000 times 50 cents per share, or $37,500.00. Judgment should be entered for respondent in this amount.